# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY B. MYERS, and
BARBARA ANN KELLY,

      Plaintiffs,

v.

                                        Casc 1:24-cv-03127-ACR

NAPLES GOLF AND BEACH CLUB, INC., a
Florida Corporation; NAPLES PROPERTY HOLDING
COMPANY, LLC, a Delaware limited liability company;
NAPLES BEACH CLUB LAND TRUST TRUSTEE, LLC,
a Delaware limited liability company, as Trustee under the
Land Trust Agreement dated as of May 27, 2021; NAPLES
BEACH CLUB PHASE II AND III LAND TRUST
TRUSTEE, LLC, a Delaware limited liability company, as
Trustee under the Land Trust Agreement dated as of
May 27 2021; and NBC CLUB OWNER, LLC, a
Delaware limited liability company,

      Defendants.

_____/



NAPLES BEACH CLUB LAND TRUST TRUSTEE, LLC,
a Delaware limited liability company, as Trustee under the
Land Trust Agreement dated as of May 27, 2021; NAPLES
BEACH CLUB PHASE II AND III LAND TRUST
TRUSTEE, LLC, a Delaware limited liability company, as
Trustee under the Land Trust Agreement dated as of
May 27 2021; and NBC CLUB OWNER, LLC, a Delaware
limited liability company,

      Defendants / Counterclaimants,

v.

GREGORY B. MYERS, and
BARBARA ANN KELLY,

      Plaintiffs / Counterdefendants.

_____/



1

## RENEWED[1] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GREGORY B. MYERS, *pro se,* pursuant to Fed. R. Civ. P. 56, hereby moves the Court for entry of summary judgment in his favor and against the Defendants, and would show:

### LEGAL STANDARD

Summary judgment is appropriate when there is no *genuine* issue as to any *material* fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if its determination one way or the other would affect the outcome of the lawsuit under the governing substantive law. *See id.* at 248. "Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes." *Id.* An issue of material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Id.* Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmovant must go beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories, and admissions on file and designate specific facts showing a genuine issue for trial. *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported ... defenses[.]" *Id.*

---

[1] Originally filed August 6, 2021. See **Exhibit B**.

## FACTS AND APPLICABLE LAW

Naples Property Holding Company, LLC ("NPHC") admits that Plaintiff "accurately states that he acquired title to his property pursuant to the Warranty Deed attached to the Complaint as Exhibit F which conveyed title to "Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract, according to the plat thereof recorded in Plat Book 2, Page 78, of the Public Records of Collier County, Florida" to "Gregory B. Myers and Barbara Ann Kelly, husband and wife, an estate by entireties."

Naples Golf and Beach Club, Inc. ("NGBC") admits that Plaintiff has a "legal interest" in "Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract" (i.e., "The only legal interest properly pied is Plaintiffs ownership of Lot 10, Subdivision of Block 7 ... ").

NGBC admits, "Yes. His deed to his home uses the words 'Naples [Golf and Beach Club] Tract.' So in 2011 the title to -- and today, the title to his lot ten, subdivision of block seven, Naples Golf and Beach Club Tract, that's the name of his plat."

NGBC admits that Block 7 lot owners have rights under Plat Book **1,** Page 63 (i.e., "all rights of Block 7 lot owners under Plat Book **1,** Page 63 were ... [.]"). Likewise for Defendant NPHC (i.e., "rights that had previously arisen under Plat Book **1,** Page 63" and "all rights of Block 7 lot owners under Plat Book **1,** Page 63" and "Plaintiffs Lot 10, was conveyed by reference to Subdivision of Block 7 [Naples Golf and Beach Club Tract]").

The map of the "Naples Golf and Beach Club Tract" recorded in Plat Book 1, Page 63, Collier County Records, dedicated "Streets, Avenues and Driveways to the use of the Public forever." The name of the recorded plat that imposed the easements - "Naples Golf and Beach Club Tract" - is part of the legal description in Plaintiffs deed. It is well settled under Florida law that where a deed refers to another deed or to a map, plat, or survey for a description, the deed,

map, plat or survey becomes as much a part of the instrument as if copied therein. *Bank of South Jacksonville v. Cammar,* 103 So. 827 (Fla. 1925) (internal citations omitted); accord *Routh v. Williams,* Et Vir, 193 So. 71 (Fla. 1940). *See also Wahrendo,ffv. Moore,* Fla.1957, 93 So.2d 720 (Fla. 1957) (reference to a plat in the description of a deed incorporates the plat's terms). Accordingly, Myers possesses appurtenant easement rights (i.e., "private rights") in the "Streets, Avenues and Driveways" marked on the map of the "Naples Golf and Beach Club Tract" recorded in Plat Book 1, Page 63, Collier County Records.

Plaintiff's easement rights are an inherently legal interest in land. *See, e.g., Homer v. Dadeland Shopping Center, Inc.,* 229 So. 2d 834, 836 (Fla. 1969) ("An easement of way is essentially an inherently legal interest in land"). This fact was confirmed by the Defendants' own expert, William Sklar, who testified under oath before the City of Naples Planning Advisory Board ("PAB") on March 13, 2019, *inter alia,* as follows:

> MR. SKLAR: The concern was this is a restrictive covenant. It could be amended. It could be terminated. It could go away. And the suggestion was to create an easement -- not unusual. It is an interest in propert[y], much greater than a restriction. *** Beyond that, the question was, well, can this easement or this covenant -- and it's still a covenant [ and] restriction -- but can this easement or covenant be taken away by operation of law because we have certain statutes that favor the passing of title. We call it the Marketable Record Title Act. Simply put, we made this perpetual. *** So we have the covenant, the easement, the statement that it's perpetuity. We added the word "forever" because that was requested in a meeting that I was at with representatives of the community just last week. And they said, well, let's put it in plain speak. I said, well, it has to say perpetuity because you want that from a legal standpoint; but it now says forever so it's clear[.] *** What if this -- there's a desire to change it? What if the owner of the property, be it the Athens Group or some successor, comes to the city, whenever, in the future and says let's change it? Well, one, the city has to agree to it.

(Alterations and emphasis supplied). A transcript of Mr. Sklar's testimony is attached hereto as

**Exhibit A.**

Plaintiff has never agreed to change or abrogate his appurtenant easement rights in Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract.

As explained by the Court in *Sunshine Vistas Homeowners Ass'n v. Caruana,* 623 So. 2d 490 (1993) (internal citations omitted), Section 712.03, Florida Statutes, provides that the Marketable Record Titles to Real Property Act ("MRTA") "shall not affect or extinguish the following rights: **(1)** Estates or interests, easements and use restrictions disclosed by and defects inherent in the muniments of title on which said estate is based beginning with the root of title; provided, however, that a general reference in any of such muniments to easements, use restrictions or other interests created prior to the root of title shall not be sufficient to preserve them unless specific identification by reference to book and page of record or by name of recorded plat be made therein to a recorded title transaction which imposed, transferred or continued such easement, use restrictions or other interests." The *Sunshine Vistas* Court further explained that "specific identification" to the title transaction can be made in one of two ways: (1) by reference to the book and page in the public records where the title transaction that imposed the restriction can be found, or (2) by reference to the name of a recorded plat that imposed the restriction. *Id.*

The Defendants have not raised any affirmative defenses which would contradict the undisputed facts set forth herein.

## CONCLUSION

Based on the foregoing facts and analysis, the *Renewed Plaintiff's Motion for Partial Summary Judgment* should be granted. Defendants have raised no affirmative defenses that would prevent summary judgment being entered in Plaintiffs favor. Consequently, the Plaintiff's *Renewed Plaintiff's Motion for Partial Summary Judgment* should be granted.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Partial Summary Judgment in Plaintiff's favor and grant such other and further relief as the law requires and justice demands.

Dated: February 5, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

Gregory B. Myers, pro se
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
*gregbmyers@verizon.net*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2025, the foregoing RENEWED PLAINTIFF'S

MOTION FOR PARTIAL SUMMARY JUDGMENT was filed with the Clerk of the District

Court and a copy of same was was furnished via first class U.S. Mail, postage prepaid to the

following parties:

Jeffrey D. Fridkin
Gunster, Yoakley & Stewart, P.A.
5551 Ridgewood Drive, Suite 501
Naples, FL 34108

Glenn T. Burhans, Jr.
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
401 E. Jackson Street, Suite 2100
Tampa, Florida 33602

<div style="text-align:right">

_____
Gregory B. Myers, pro se

</div>

# Exhibit A

CITY OF NAPLES

PLANNING ADVISORY BOARD MEETING

MARCH 13, 2019

-   -   -

(TRANSCRIPTION STARTING AT 1:08 - 1:23)

-   -   -

Naples Court Reporting & Legal Services
2315 Stanford Court
Suite 301
Naples, Florida  34112
(239) 316-7733

NaplesCourtReporting.com



 1          MR. SKLAR:  Good morning, Chairman and Members of

 2     the Planning Advisory Board.  My name is William

 3     Sklar.  I'm an attorney of counsel to the law firm of

 4     Carlton Fields based in its West Palm Beach and

 5     Tallahassee offices.  I was engaged approximately two

 6     months ago to review a particular issue I'm going to

 7     address regarding this development plan.  It's my

 8     privilege to be before you today.

 9          THE CHAIRMAN:  Excuse me.  All your background's

10     on file?

11          MR. SKLAR:  My background's on file, but I will

12     give you a very brief description.  Besides practicing

13     law for 39 years in the area of condominium planned

14     and mixed-use development throughout the state of

15     Florida, the Southeast, and, indeed, throughout the

16     country, I'm also a member of the graduate faculty of

17     the University of Miami School of Law for 40 years

18     teaching courses in its LLM Master of Laws program,

19     condominium planned development law and advanced

20     planning and real estate issues since 1980, and chair

21     the Condominium and Planned Development Committee of

22     the Florida Bar's Real Property section and am

23     director of the Boyer Institute on Condominium and

24     Planned Development in its 44th year now at the

25     University of Miami, as well as being double board

1   certified in real estate law and condominium and

2   planned development law by the Florida Bar and sitting

3   on its certification committee, and a fellow of the

4   American College of Real Estate Lawyers, the fellow of

5   the College of Community Association lawyers.

6        And as I said, it's a privilege to be here today.

7        THE CHAIRMAN:  Your testimony today is going to

8   be on?

9        MR. SKLAR:  My testimony's going to be with

10  regard to the protection and preservation of what has

11  been referred to as the open-space area of this

12  project, the golf course in particular, and the steps

13  and protections that have been provided and have

14  evolved and added in the approximate eight weeks since

15  I was engaged to look at this and make recommendations

16  and comment on that briefly relative to those items

17  that ensure -- ensure the open space, what is -- we

18  will refer to as the golf course for purposes of this

19  presentation and similar open areas are -- remain in

20  perpetuity and, simply put, forever as those open

21  areas.

22        When Mr. Passidomo contacted me on behalf of the

23  petitioner applicant, it was expressed that there were

24  some concerns expressed, legitimate concerns by

25  members of the community, by neighbors regarding

1    ensuring, as I mentioned, that these areas would

2    remain open spaces and what I would do in planning and

3    recommending and drafting those steps to be taken.

4    And I just want to briefly comment and answer any

5    questions relative to that.

6         THE CHAIRMAN:  Just to interrupt, he's

7    acceptable, his testimony, to you too also, staff?

8         Okay.  Good.

9         MR. SKLAR:  Thank you.

10        THE CHAIRMAN:  Thank you.

11        MR. SKLAR:  Initially, I was presented a proposed

12   declaration of covenants, restrictions, conditions.

13   Simply put, we often use covenants, conditions and

14   restrictions to restrict the use of real property.  We

15   do that all the time in developments, and it's well

16   accepted in Florida and elsewhere.  The concern was

17   this is a restrictive covenant.  It could be amended.

18   It could be terminated.  It could go away.

19        And the suggestion was to create an easement --

20   not unusual.  It is an interest in properties, much

21   greater than a restriction.  And then the question

22   became what type of easement would it be.  It's what

23   we call a negative easement, meaning what you can do

24   and what you can't do to property.

25        I was asked the question:  Well, I've seen



1    easements allowing someone to use someone's property

2    for utilities or roadway; but what's this negative

3    easement?

4        And without getting too technical, but it is what

5    we call an easement in gross.  It is permissible.  The

6    courts of Florida for 80 years, I believe, have said

7    these are -- these are permissible.  They restrict the

8    use of property.

9        Beyond that, the question was, well, can this

10    easement or this covenant -- and it's still a covenant

11    in restriction -- but can this easement or covenant be

12    taken away by operation of law because we have certain

13    statutes that favor the passing of title.  We call it

14    the Marketable Record Title Act.  Simply put, we made

15    this perpetual.  And this negative easement is

16    perpetual.  And there was a slide shown earlier about

17    the -- showing the declaration and its amendments, and

18    it says in perpetuity.

19        But beyond that, we defined open space.  And

20    somewhat unusual from my experience, but certainly

21    very, very proactive, there was a quantitative

22    commitment, not only defining what open spaces,

23    including the golf course, but not less than 70 acres.

24    So we have a quantitative commitment.  We did not

25    limit it to the description of a golf course but a

 1  quantitative commitment.

 2      So we have the covenant, the easement, the

 3  statement that it's perpetuity.  We added the word

 4  "forever" because that was requested in a meeting that

 5  I was at with representatives of the community just

 6  last week.  And they said, well, let's put it in plain

 7  speak.  I said, well, it has to say perpetuity because

 8  you want that from a legal standpoint; but it now says

 9  forever so it's clear, the 70 acres.

10      Then the question is what uses can be on that

11  open space, that golf course.  And consistent with the

12  code -- and I was presented with this -- here are the

13  permitted uses.  They haven't changed.  They're in

14  there what the permitted uses are, principally a golf

15  course.  But those are stated.

16      So it's not only it has to remain open, has to be

17  70 acres, it's an enforceable easement, it's an

18  enforceable covenant, but here are the only uses that

19  could ever, forever be on that property.

20      Then the question comes to make this realistic

21  from a practical standpoint:  Who enforces it?

22      First, it's in favor of the city.  And there was

23  a concern stated, well, we love the city, but who

24  knows what's going to happen 10, 20, 30, 40 years from

25  now in terms of the policies and the changes in the

1    city.  So we want something guaranteeing something

2    beyond the city enforcing it.  And it was added that a

3    third party, yet to be determined, would also have the

4    right to enforce it further.

5         What if this -- there's a desire to change it?

6    What if the owner of the property, be it the Athens

7    Group or some successor, comes to the city, whenever,

8    in the future and says let's change it?

9         Well, one, the city has to agree to it.  But the

10   third party also has to agree to it.

11        Further, it was -- a concern was presented about

12   ten days or so ago, well, what if the city decides for

13   whatever reason -- expense, fiscal reason -- they're

14   going to re-convey this to the then owner of the

15   property.  Basically, we put in there it cannot be

16   re-conveyed meaning the easement cannot be terminated

17   through a re-conveyance.  Again, it would be the city

18   and the guarantee of the third party having to agree

19   with it.  So it's not amendable, terminable or

20   re-conveyable.

21        What's the point of all that?

22        To create, as to use a non-legal term, is

23   bulletproof -- and nothing in life is bulletproof --

24   but as close to it as legally one can create.

25   Certainly, it's extraordinary in my 39 years of



1    experience the amount, the qualitatively and

2    quantitatively the protections that are being given

3    here, all for a good reason, all for a good reason,

4    the protection of the character of the open space for

5    the benefit of the community.

6        I need to point out one other thing so there's no

7    misconception.  This is a golf course.  By definition,

8    it's already been developed.  It's not a scrubland.

9    It's not a habitat.  There may be animals and birds

10   and such that use it as their habitation, and that's

11   wonderful.  But it's not a natural environment like

12   you would set aside a hundred acres of scrubland or

13   untouched vegetation, and that's important because it

14   should not be misinterpreted that we're creating a

15   natural preserve here.

16       It is in a sense but not in the ecological and

17   environmental statutory sense.  I want to make that --

18   because people use it, people traverse it for a

19   limited recreational golf course purpose.  But it has

20   been developed as a golf course, but it is being

21   preserved as an open space.

22       And with that, I'd be happy to answer any

23   questions.

24           THE CHAIRMAN:  Questions for Mr. Sklar?

25           No?



1       COMMISSIONER 1:  Has there been -- I'm sorry.

2       COMMISSIONER 2:  No.  You first.

3       COMMISSIONER 1:  Has there been any progress

4  toward identifying the third party, and what type of

5  third party do you conceive of?

6       MR. SKLAR:  I'm going to have to defer to

7  Mr. Passidomo in that regard.  I've not been -- I've

8  not been party to those discussions.

9       COMMISSIONER 1:  Have you ever heard of a third

10  party having enforceability on a negative easement?

11       MR. SKLAR:  Yes, I have.  And, again, I'll defer

12  to Mr. Passidomo.

13       My one suggestion, not having been part of this,

14  that it be a party that has familiarity with the

15  locale, not just a national third party but someone

16  who understands -- and I say this with the utmost

17  sincerity; I have stayed at the resort since I was ten

18  years old with my family, so I understand it's iconic

19  -- but understands the quality and nature, what you

20  are preserving here, and has some familiarity as

21  opposed to just a national organization that has no

22  local connections.

23       COMMISSIONER 1:  Thank you.

24       THE CHAIRMAN:  Okay.

25       COMMISSIONER 2:  Anyone else can go.

1      COMMISSIONER 1:  I also have a question for our

2   city attorney.  Have you reviewed the easement, and do

3   you have an opinion on it?

4      THE CITY ATTORNEY:  Many, many, many, many times.

5      Yeah.  I have a legal opinion only.  I am not

6   commenting on --

7      COMMISSIONER 1:  No, no, I understand.

8      THE CITY ATTORNEY:  -- the policy issues because

9   I am the attorney for the City of Naples.  And the

10  City of Naples is represented by elected officials,

11  and those elected officials have not met at a public

12  meeting and discussed or given me directions.  So that

13  leaves me to look at things like clarity, finality and

14  legality.

15      And while there were some things early on that I

16  simply could not live with, those have all been

17  changed.  And in its current form, I can live with

18  this.

19      I know this is going to be really politically

20  incorrect, but I'm a lawyer.  And so to the extent

21  that I have to give legal advice, I feel compelled to

22  say this.  And if somebody gets upset about it, I

23  apologize.  But it won't change my legal opinion.

24      Whenever anybody says I want you, the elected

25  officials, to be responsive to me today and what I



1    want you to do is make sure that the people's elected

2    representatives tomorrow can't do anything, I

3    fundamentally oppose that.  That is wrong.  That's not

4    consistent with our system of government.

5         Now, I remember as a very young attorney getting

6    some advice from the former president of CBS who said

7    if you want to get anything done you have to get the

8    attorneys and the accountants out of the room because

9    they will tell you all the reasons you can't get it

10   done and you shouldn't do it.  I don't want to be the

11   monkey wrench to prevent this from happening.

12        I'm trying to render an opinion that I can live

13   with, and I don't want to make the perfect the enemy

14   of the good.  The perfect is that this land be given

15   to the city.  The city knows how to hold property in

16   trust.  It knows how to hold parks in trust.  It knows

17   how to hold land in trust.  And there's always a

18   mechanism for the people to come back, and that great

19   experiment in representative democracy is something

20   that we all believe in.

21        But if this deal can't be done without this

22   particular legal --

23        COMMISSIONER 1:  Third party.  Third party.

24        MR. SKLAR:  -- in perpetuity, Mr. Passidomo and

25   the petitioners have worked endlessly I would say.  We



1    have been on the phone.  We have gone over drafts and

2    drafts and drafts.  I believe Mr. Grant who is one of

3    our icons of real property here has been over it.

4         And is it -- is it perfect?

5         No, for the reasons I have stated.

6         Can I live with it in its current form?

7         Yes.

8         COMMISSIONER 1:  Thank you.

9         THE CHAIRMAN:  Okay.

10        (End of requested portion of recording.)

11                         -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                  C E R T I F I C A T E

2

3

4          I, Susan C. Baker, Registered Merit

5     Reporter/Certified Realtime Reporter, do hereby certify

6     that I was authorized to transcribe the foregoing recorded

7     meeting and that the transcript is a true and accurate

8     transcription of my stenographic notes, to the best of my

9     ability, taken while listening to the provided recording.

10         I further certify that I am not of counsel or

11    attorney for either or any of the parties to said meeting,

12    nor in any way interested in the events of this cause, and

13    that I am not related to any of the parties hereto.

14

15         Dated this 5th day of August, 2021.

16

17

18         Susan C. Baker, RMR, CRR

19

20

21

22

23

24

25



# Exhibit B

Filing # 132192155 E-Filed 08/06/2021 01:20:07 PM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT**
**IN AND FOR COLLIER COUNTY, FLORIDA**
**CIVIL DIVISION**

GREGORY B. MYERS,

      Plaintiff,

Case No. 21-CA-1441

v.

NAPLES GOLF AND BEACH CLUB, INC., and
NAPLES PROPERTY HOLDING COMPANY, LLC

      Defendants.

_____/

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, GREGORY B. MYERS (hereinafter "Myers" or "Plaintiff"), *pro se*, pursuant to Fla. R. Civ. P. 1.510, hereby moves the Court for entry of an order for Partial Summary Judgment in his favor and against the Defendants, NAPLES GOLF AND BEACH CLUB, INC. ("NGBC") and NAPLES PROPERTY HOLDING COMPANY, LLC ("NPHC") (with NGBC and NPHC each being a "Defendant" and collectively, the "Defendants") (the "Motion"). Based on the pleadings, there exist no genuine issues of material fact and Plaintiff is entitled to judgment as a matter of law. In support of his motion, Plaintiff states as follows:

### LEGAL STANDARD

1.      Plaintiff is entitled to summary judgment in its favor if this Court finds "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(c). Once Plaintiff has shown no issue of material fact exists, the burden shifts to the Defendant(s) to assert a genuine material disputed issue of fact, and it is insufficient to merely assert that an issue exists. *See Landers* v. *Milton,* 370 So. 2d 368, 369 (Fla.

1

1979). Here, there is no genuine issue of material fact and Plaintiff is entitled to a judgment as a matter of law. Therefore, partial final summary judgment should be issued in the Plaintiffs favor.

## FACTS AND APPLICABLE LAW

2.      NPHC admits that Plaintiff "accurately states that he acquired title to his property pursuant to the Warranty Deed attached to the Complaint as Exhibit F which conveyed title to "Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract, according to the plat thereof recorded in Plat Book 2, Page 78, of the Public Records of Collier County, Florida" to "Gregory B. Myers and Barbara Ann Kelly, husband and wife, an estate by entireties."

3.      NGBC admits that Plaintiff has a "legal interest" in "Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract" (i.e., "The only legal interest properly pled is Plaintiff's ownership of Lot 10, Subdivision of Block 7…").

4.      NGBC admits, "Yes. His deed to his home uses the words 'Naples [Golf and Beach Club] Tract.' So in 2011 the title to -- and today, the title to his lot ten, subdivision of block seven, Naples Golf and Beach Club Tract, that's the name of his plat."

5.      NGBC admits that Block 7 lot owners have rights under Plat Book 1, Page 63 (i.e., "all rights of Block 7 lot owners under Plat Book 1, Page 63 were… [.]"). Likewise for Defendant NPHC (i.e., "rights that had previously arisen under Plat Book 1, Page 63" and "all rights of Block 7 lot owners under Plat Book 1, Page 63" and "Plaintiffs Lot 10, was conveyed by reference to Subdivision of Block 7 [Naples Golf and Beach Club Tract]").

6.      The map of the "Naples Golf and Beach Club Tract" recorded in Plat Book 1, Page 63, Collier County Records, dedicated "Streets, Avenues and Driveways to the use of the Public forever." The name of the recorded plat that imposed the easements - "Naples Golf and Beach

2

Club Tract" - is part of the legal description in Plaintiff's deed. It is well settled under Florida law that where a deed refers to another deed or to a map, plat, or survey for a description, the deed, map, plat or survey becomes as much a part of the instrument as if copied therein. *Bank of South Jacksonville v. Cammar*, 103 So. 827 (Fla. 1925) (internal citations omitted); accord *Routh v. Williams*, Et Vir, 193 So. 71 (Fla. 1940). *See also Wahrendorff v. Moore*, Fla.1957, 93 So.2d 720 (Fla. 1957) (reference to a plat in the description of a deed incorporates the plat's terms). Accordingly, Myers possesses appurtenant easement rights (i.e., "private rights") in the "Streets, Avenues and Driveways" marked on the map of the "Naples Golf and Beach Club Tract" recorded in Plat Book 1, Page 63, Collier County Records.

7.      Plaintiff's easement rights are an inherently legal interest in land. *See, e.g., Homer v. Dadeland Shopping Center, Inc.*, 229 So. 2d 834, 836 (Fla. 1969) ("An easement of way is essentially an inherently legal interest in land"). This fact was confirmed by the Defendants' own expert, William Sklar, who testified <u>under oath</u> before the City of Naples Planning Advisory Board ("PAB") on March 13, 2019, *inter alia*, as follows:

> MR. SKLAR: The concern was this is a restrictive covenant. It could be amended. It could be terminated. It could go away. And the suggestion was to create an easement -- not unusual. <u>It is an interest in propert[y], much greater than a restriction</u>. *** Beyond that, the question was, well, can this easement or this covenant -- and <u>it's still a covenant</u> [and] restriction -- but can this easement or covenant be taken away by operation of law because we have certain statutes that favor the passing of title. We call it the Marketable Record Title Act. <u>Simply put, we made this perpetual</u>. *** <u>So we have the covenant, the easement, the statement that it's perpetuity</u>. We added the word "forever" because that was requested in a meeting that I was at with representatives of the community just last week. And they said, well, let's put it in plain speak. I said, well, it has to say perpetuity because you want that from a legal standpoint; but it now <u>says forever so it's clear</u>[.] *** What if this -- there's a desire to change it? What if the owner of the property, be it the Athens Group or some successor, comes to the city, whenever, in the future and says let's change it? Well, one, the <u>city has to agree to it</u>.

3

(Alterations and emphasis supplied). A transcript of Mr. Sklar's testimony is attached hereto as **Exhibit A**.

8. Plaintiff has never agreed to change or abrogate his appurtenant easement rights in Lot 10, Subdivision of Block 7, Naples Golf and Beach Club Tract.

9. As explained by the Court in *Sunshine Vistas Homeowners Ass'n v. Caruana,* 623 So. 2d 490 (1993) (internal citations omitted), Section 712.03, Florida Statutes, provides that the Marketable Record Titles to Real Property Act ("MRTA") "shall not affect or extinguish the following rights: (1) Estates or interests, easements and use restrictions disclosed by and defects inherent in the muniments of title on which said estate is based beginning with the root of title; provided, however, that a general reference in any of such muniments to easements, use restrictions or other interests created prior to the root of title shall not be sufficient to preserve them unless specific identification by reference to book and page of record or by name of recorded plat be made therein to a recorded title transaction which imposed, transferred or continued such easement, use restrictions or other interests." The *Sunshine Vistas* Court further explained that "specific identification" to the title transaction can be made in one of two ways: (1) by reference to the book and page in the public records where the title transaction that imposed the restriction can be found, or (2) by reference to the name of a recorded plat that imposed the restriction. *Id.*

10. The Defendants have not raised any affirmative defenses which would contradict the undisputed facts set forth herein.

## CONCLUSION

11. Based on the foregoing facts and analysis, the Plaintiffs Motion for Partial Summary Judgment should be granted. Defendants have raised no affirmative defenses that would

prevent Partial Summary Judgment being entered in Plaintiff's favor. Consequently, the Plaintiff should be granted Partial Summary Judgment.

WHEREFORE, Plaintiff respectfully requests that this Court enter Partial Summary Judgment in Plaintiffs favor and grant such other and further relief as the law requires and justice demands.

Respectfully submitted,

/s/ Gregory B. Myers
Gregory B. Myers, *pro se*
700 Gulf Shore Blvd. N.
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of August, 2021, the foregoing PLAINTIFF'S

MOTION FOR PARTIAL SUMMARY JUDGMENT as filed with the Clerk of Court using the

Florida E-Portal and a copy of same was electronically served via email to the following parties:

Jeffrey D. Fridkin
Alexandra D. Gabel
GRANT FRIDKIN PEARSON, P.A.
5551 Ridgewood Drive, Suite 501
Naples, Florida 34108

Alice R. Huneycutt
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
401 E. Jackson Street, Suite 2100
Post Office Box 3299 (33601)
Tampa, Florida 33602

/s/ Gregory B. Myers
Gregory B. Myers, *pro se*

6

# Exhibit A

1

2

3

4

5                      CITY OF NAPLES

6            PLANNING ADVISORY BOARD MEETING

7                   MARCH 13, 2019

8                      -   -   -

9        (TRANSCRIPTION STARTING AT 1:08 - 1:23)

10                     -   -   -

11

12

13

14

15

16

17

18

19

20

21        Naples Court Reporting & Legal Services
22                 2315 Stanford Court
                       Suite 301
                 Naples, Florida  34112
23                  (239) 316-7733

24            NaplesCourtReporting.com

25



1      MR. SKLAR:  Good morning, Chairman and Members of

2   the Planning Advisory Board.  My name is William

3   Sklar.  I'm an attorney of counsel to the law firm of

4   Carlton Fields based in its West Palm Beach and

5   Tallahassee offices.  I was engaged approximately two

6   months ago to review a particular issue I'm going to

7   address regarding this development plan.  It's my

8   privilege to be before you today.

9      THE CHAIRMAN:  Excuse me.  All your background's

10  on file?

11     MR. SKLAR:  My background's on file, but I will

12  give you a very brief description.  Besides practicing

13  law for 39 years in the area of condominium planned

14  and mixed-use development throughout the state of

15  Florida, the Southeast, and, indeed, throughout the

16  country, I'm also a member of the graduate faculty of

17  the University of Miami School of Law for 40 years

18  teaching courses in its LLM Master of Laws program,

19  condominium planned development law and advanced

20  planning and real estate issues since 1980, and chair

21  the Condominium and Planned Development Committee of

22  the Florida Bar's Real Property section and am

23  director of the Boyer Institute on Condominium and

24  Planned Development in its 44th year now at the

25  University of Miami, as well as being double board

1    certified in real estate law and condominium and

2    planned development law by the Florida Bar and sitting

3    on its certification committee, and a fellow of the

4    American College of Real Estate Lawyers, the fellow of

5    the College of Community Association lawyers.

6         And as I said, it's a privilege to be here today.

7         THE CHAIRMAN:  Your testimony today is going to

8    be on?

9         MR. SKLAR:  My testimony's going to be with

10   regard to the protection and preservation of what has

11   been referred to as the open-space area of this

12   project, the golf course in particular, and the steps

13   and protections that have been provided and have

14   evolved and added in the approximate eight weeks since

15   I was engaged to look at this and make recommendations

16   and comment on that briefly relative to those items

17   that ensure -- ensure the open space, what is -- we

18   will refer to as the golf course for purposes of this

19   presentation and similar open areas are -- remain in

20   perpetuity and, simply put, forever as those open

21   areas.

22        When Mr. Passidomo contacted me on behalf of the

23   petitioner applicant, it was expressed that there were

24   some concerns expressed, legitimate concerns by

25   members of the community, by neighbors regarding



1   ensuring, as I mentioned, that these areas would

2   remain open spaces and what I would do in planning and

3   recommending and drafting those steps to be taken.

4   And I just want to briefly comment and answer any

5   questions relative to that.

6       THE CHAIRMAN:  Just to interrupt, he's

7   acceptable, his testimony, to you too also, staff?

8       Okay.  Good.

9       MR. SKLAR:  Thank you.

10      THE CHAIRMAN:  Thank you.

11      MR. SKLAR:  Initially, I was presented a proposed

12  declaration of covenants, restrictions, conditions.

13  Simply put, we often use covenants, conditions and

14  restrictions to restrict the use of real property.  We

15  do that all the time in developments, and it's well

16  accepted in Florida and elsewhere.  The concern was

17  this is a restrictive covenant.  It could be amended.

18  It could be terminated.  It could go away.

19      And the suggestion was to create an easement --

20  not unusual.  It is an interest in properties, much

21  greater than a restriction.  And then the question

22  became what type of easement would it be.  It's what

23  we call a negative easement, meaning what you can do

24  and what you can't do to property.

25      I was asked the question:  Well, I've seen



1   easements allowing someone to use someone's property

2   for utilities or roadway; but what's this negative

3   easement?

4       And without getting too technical, but it is what

5   we call an easement in gross.  It is permissible.  The

6   courts of Florida for 80 years, I believe, have said

7   these are -- these are permissible.  They restrict the

8   use of property.

9       Beyond that, the question was, well, can this

10  easement or this covenant -- and it's still a covenant

11  in restriction -- but can this easement or covenant be

12  taken away by operation of law because we have certain

13  statutes that favor the passing of title.  We call it

14  the Marketable Record Title Act.  Simply put, we made

15  this perpetual.  And this negative easement is

16  perpetual.  And there was a slide shown earlier about

17  the -- showing the declaration and its amendments, and

18  it says in perpetuity.

19      But beyond that, we defined open space.  And

20  somewhat unusual from my experience, but certainly

21  very, very proactive, there was a quantitative

22  commitment, not only defining what open spaces,

23  including the golf course, but not less than 70 acres.

24  So we have a quantitative commitment.  We did not

25  limit it to the description of a golf course but a

1    quantitative commitment.

2        So we have the covenant, the easement, the

3    statement that it's perpetuity.  We added the word

4    "forever" because that was requested in a meeting that

5    I was at with representatives of the community just

6    last week.  And they said, well, let's put it in plain

7    speak.  I said, well, it has to say perpetuity because

8    you want that from a legal standpoint; but it now says

9    forever so it's clear, the 70 acres.

10       Then the question is what uses can be on that

11   open space, that golf course.  And consistent with the

12   code -- and I was presented with this -- here are the

13   permitted uses.  They haven't changed.  They're in

14   there what the permitted uses are, principally a golf

15   course.  But those are stated.

16       So it's not only it has to remain open, has to be

17   70 acres, it's an enforceable easement, it's an

18   enforceable covenant, but here are the only uses that

19   could ever, forever be on that property.

20       Then the question comes to make this realistic

21   from a practical standpoint:  Who enforces it?

22       First, it's in favor of the city.  And there was

23   a concern stated, well, we love the city, but who

24   knows what's going to happen 10, 20, 30, 40 years from

25   now in terms of the policies and the changes in the

1  city.  So we want something guaranteeing something

2  beyond the city enforcing it.  And it was added that a

3  third party, yet to be determined, would also have the

4  right to enforce it further.

5       What if this -- there's a desire to change it?

6  What if the owner of the property, be it the Athens

7  Group or some successor, comes to the city, whenever,

8  in the future and says let's change it?

9       Well, one, the city has to agree to it.  But the

10 third party also has to agree to it.

11      Further, it was -- a concern was presented about

12 ten days or so ago, well, what if the city decides for

13 whatever reason -- expense, fiscal reason -- they're

14 going to re-convey this to the then owner of the

15 property.  Basically, we put in there it cannot be

16 re-conveyed meaning the easement cannot be terminated

17 through a re-conveyance.  Again, it would be the city

18 and the guarantee of the third party having to agree

19 with it.  So it's not amendable, terminable or

20 re-conveyable.

21      What's the point of all that?

22      To create, as to use a non-legal term, is

23 bulletproof -- and nothing in life is bulletproof --

24 but as close to it as legally one can create.

25 Certainly, it's extraordinary in my 39 years of



1    experience the amount, the qualitatively and

2    quantitatively the protections that are being given

3    here, all for a good reason, all for a good reason,

4    the protection of the character of the open space for

5    the benefit of the community.

6        I need to point out one other thing so there's no

7    misconception.  This is a golf course.  By definition,

8    it's already been developed.  It's not a scrubland.

9    It's not a habitat.  There may be animals and birds

10   and such that use it as their habitation, and that's

11   wonderful.  But it's not a natural environment like

12   you would set aside a hundred acres of scrubland or

13   untouched vegetation, and that's important because it

14   should not be misinterpreted that we're creating a

15   natural preserve here.

16       It is in a sense but not in the ecological and

17   environmental statutory sense.  I want to make that --

18   because people use it, people traverse it for a

19   limited recreational golf course purpose.  But it has

20   been developed as a golf course, but it is being

21   preserved as an open space.

22       And with that, I'd be happy to answer any

23   questions.

24       THE CHAIRMAN:  Questions for Mr. Sklar?

25       No?



```
1        COMMISSIONER 1:  Has there been -- I'm sorry.
2        COMMISSIONER 2:  No.  You first.
3        COMMISSIONER 1:  Has there been any progress
4   toward identifying the third party, and what type of
5   third party do you conceive of?
6        MR. SKLAR:  I'm going to have to defer to
7   Mr. Passidomo in that regard.  I've not been -- I've
8   not been party to those discussions.
9        COMMISSIONER 1:  Have you ever heard of a third
10  party having enforceability on a negative easement?
11       MR. SKLAR:  Yes, I have.  And, again, I'll defer
12  to Mr. Passidomo.
13       My one suggestion, not having been part of this,
14  that it be a party that has familiarity with the
15  locale, not just a national third party but someone
16  who understands -- and I say this with the utmost
17  sincerity; I have stayed at the resort since I was ten
18  years old with my family, so I understand it's iconic
19  -- but understands the quality and nature, what you
20  are preserving here, and has some familiarity as
21  opposed to just a national organization that has no
22  local connections.
23       COMMISSIONER 1:  Thank you.
24       THE CHAIRMAN:  Okay.
25       COMMISSIONER 2:  Anyone else can go.
```

```
1        COMMISSIONER 1:  I also have a question for our
2   city attorney.  Have you reviewed the easement, and do
3   you have an opinion on it?
4        THE CITY ATTORNEY:  Many, many, many, many times.
5        Yeah.  I have a legal opinion only.  I am not
6   commenting on --
7        COMMISSIONER 1:  No, no, I understand.
8        THE CITY ATTORNEY:  -- the policy issues because
9   I am the attorney for the City of Naples.  And the
10  City of Naples is represented by elected officials,
11  and those elected officials have not met at a public
12  meeting and discussed or given me directions.  So that
13  leaves me to look at things like clarity, finality and
14  legality.
15       And while there were some things early on that I
16  simply could not live with, those have all been
17  changed.  And in its current form, I can live with
18  this.
19       I know this is going to be really politically
20  incorrect, but I'm a lawyer.  And so to the extent
21  that I have to give legal advice, I feel compelled to
22  say this.  And if somebody gets upset about it, I
23  apologize.  But it won't change my legal opinion.
24       Whenever anybody says I want you, the elected
25  officials, to be responsive to me today and what I
```



1    want you to do is make sure that the people's elected

2    representatives tomorrow can't do anything, I

3    fundamentally oppose that.  That is wrong.  That's not

4    consistent with our system of government.

5        Now, I remember as a very young attorney getting

6    some advice from the former president of CBS who said

7    if you want to get anything done you have to get the

8    attorneys and the accountants out of the room because

9    they will tell you all the reasons you can't get it

10   done and you shouldn't do it.  I don't want to be the

11   monkey wrench to prevent this from happening.

12       I'm trying to render an opinion that I can live

13   with, and I don't want to make the perfect the enemy

14   of the good.  The perfect is that this land be given

15   to the city.  The city knows how to hold property in

16   trust.  It knows how to hold parks in trust.  It knows

17   how to hold land in trust.  And there's always a

18   mechanism for the people to come back, and that great

19   experiment in representative democracy is something

20   that we all believe in.

21       But if this deal can't be done without this

22   particular legal --

23       COMMISSIONER 1:  Third party.  Third party.

24       MR. SKLAR:  -- in perpetuity, Mr. Passidomo and

25   the petitioners have worked endlessly I would say.  We

1     have been on the phone.  We have gone over drafts and

2     drafts and drafts.  I believe Mr. Grant who is one of

3     our icons of real property here has been over it.

4          And is it -- is it perfect?

5          No, for the reasons I have stated.

6          Can I live with it in its current form?

7          Yes.

8          COMMISSIONER 1:  Thank you.

9          THE CHAIRMAN:  Okay.

10         (End of requested portion of recording.)

11                              -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25



<pre>
 1                    C E R T I F I C A T E

 2

 3

 4          I, Susan C. Baker, Registered Merit

 5   Reporter/Certified Realtime Reporter, do hereby certify

 6   that I was authorized to transcribe the foregoing recorded

 7   meeting and that the transcript is a true and accurate

 8   transcription of my stenographic notes, to the best of my

 9   ability, taken while listening to the provided recording.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties to said meeting,

12   nor in any way interested in the events of this cause, and

13   that I am not related to any of the parties hereto.

14

15          Dated this 5th day of August, 2021.

16

17

18          Susan C. Baker, RMR, CRR

19

20

21

22

23

24

25
</pre>

